## LOUISIANA OIL & REFINING CORPORATION et al. v. TEXAS & P. RY. CO. et al.

### No. 2359.

District Court, W. D. Louisiana. Shreveport Division.

Oct. 7, 1933.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, La., for plaintiffs.

Wilkinson, Lewis & Wilkinson, of Shreveport, La., for defendants.

DAWKINS, District Judge.

This is a suit at law by the Louisiana Oil & Refining Corporation and the Sims Oil Company to recover of the defendant railways an award of reparations made by the Interstate Commerce Commission (hereinafter referred to as the Commission) for overcharge of freight rates on shipments of refined petroleum products from Shreveport, La., to points in Texas.

The defense is that the Commission was without lawful authority to award reparations, for the reason that it had fixed or approved the rates charged, and could not therefore, under the holding in Arizona Grocery Co. v. Atchison, Topeka & Santa Fé Ry. Co., 284 U. S. 370, 52 S. Ct. 183, 76 L. Ed. 348, give to its finding of unreasonableness of the rates retroactive effect.

The issue turns upon whether the rates were made by the defendant railway companies or were fixed or approved by the Commission. The jury has been waived and the matter submitted upon an agreed statement of facts.

I find the facts as stated in the stipulation:

In an order dated January 22, 1918, made effective May 1st of that year, the Commission, in its Docket No. 8418, prescribed rates for refined petroleum products from Shreveport to Texas destinations, but at the same time provided that they should not exceed those prescribed in the fifth class rates (in which refined petroleum products fell) as distinguished from commodity rates. In other words, the railroads had the option to use the commodity rates or the class rates alternatively, so long as the fifth class rate applicable to any shipment was not exceeded. This meant simply that they could apply the commodity rates if less or equal to the fifth class, but, if the former exceeded the latter to a particular destination, then the latter had to apply.

The railroads of the country having been taken over by the government the latter part

of 1917, under its powers incident to a state of war, the Director General of Railroads, by a general order, made these rates effective, but on May 25, 1918, this officer by another general order, No. 28, required a general increase in rates by the railroads under his control of 25 per cent., which was without specific reference to refined petroleum products. On May 27, 1918, immediately following the action of the Director General, the Commission "modified its order in Docket No. 8418, of January 22, 1918, to the extent of permitting the publication and maintenance of rates not in excess of those prescribed by the Director General." Subsequently, by general order, effective August 10, 1918, the Director General substituted an increase of 4.5 cents per hundred pounds on refined petroleum products in place of the aforesaid 25 per cent. general increase made in General Order No. 28. On April 25, 1920, the Commission entered a further order in its Docket No. 8418 (which was the one fixing rates for refined petroleum products and which had restricted them so as to not exceed fifth class rates), and "directing that its prior order of January 22, 1918, be further modified so as to continue in effect until further order of the Commission."

On July 29, 1920, the Commission, in its Docket Ex Parte 74, entitled "Increased Rates 1920," authorized a general rate increase of 35 per cent., applicable to, but not specific as to, refined petroleum products, "which increased rates were published and made effective as of August 26, 1920."

On May 16, 1922, the Commission, in its Docket No. 13293, entitled "Reduced Rates 1922," made the finding and determination that on and after July 1, 1922, the then existing freight rates and charges would be "unjust and unreasonable to the extent that they should exceed more than 21.5 the rates in the Western group, in which is included the territory herein involved, that were in effect August 25, 1920, immediately before the 30% increase provision authorized became effective." No order was entered by the Commission, but the railroads put the reduction into effect in accordance with the finding of the Commission.

From May 1, 1918, to July 14, 1928, the commodity rates on refined petroleum products did not exceed the fifth class rates and for the longer hauls were substantially less. From July 14, 1928, to December 15, 1931, the commodity rates on refined petroleum products did "materially exceed the contemporaneous fifth class rates, as prescribed by

the Commission in its docket No. 13535, but were materially less than the prior fifth class rates," that is, prior to July 14, 1928, for the longer destinations. These fifth class rates for the longer destinations were continued in effect for alternative application after July 15, 1928, and during the period involved in this case.

The Commission, in its Docket No. 17000, "Rate Structure Investigation, Part 4-A, Rates on Refined Petroleum Products from, between and to points in the Southwest," rendered an order effective December 15, 1931, reducing the rates on refined petroleum products to figures less than the prevailing fifth class rates to destinations involved in this case, and on August 6, 1932, awarded reparations against the defendants for the difference between the rates actually collected by the railroads and the contemporaneous fifth class rates, over the period from July 14, 1928, to December 15, 1931. This applied to the interstate rates from Shreveport to the several destinations, but the Commission did not see fit to award reparations as to the intrastate rates within the state of Texas to the same destinations, which under its order in Docket No. 8418 and subsequent increases had been raised on the same basis as those exacted by defendants.

As indicated by the style of the investigation in its Docket No. 17000, quoted above, a very large number of complaints and investigations were consolidated, involving carload shipments in the southwestern states of Arkansas, Kansas, Oklahoma, Texas, Louisiana, and Missouri. In disposing of the complaint here, very little space was devoted in the opinion of one hundred pages to the issues of that case, numbered 20002 on its docket, and the conclusion announced was: "We find that the rates in No. 20002 were unreasonable after July 14, 1928, to the extent that they exceeded the contemporaneous fifth class rates, and that otherwise the rates assailed were not unreasonable."

No additional evidence has been introduced before this court as to the reasonableness of these rates, so that the sole question, as I see it, is as to whether the action taken by the Commission as outlined above can be said to have amounted to either a fixing or an approval of the rates charged and collected by the defendants over the period in controversy; if so, then, under the ruling in the Arizona Grocery Company Case, supra, the Commission could not award reparations, but, if not, and the rates were carrier-made, its award of reparations cannot be disturbed.

I do not find that the requirement of the Commission, in its order No. 8418, that commodity rates on refined petroleum products should not exceed fifth class rates, was ever changed in any of the subsequent orders. The first horizontal increase of 25 per cent. ordered by the Director General and approved by the Commission, in its Docket No. 8418, applied to both commodity and class rates; hence it kept those charges by the defendants within the requirement that they should not exceed the class rates, and this was likewise true of the change by the Director General which applied a flat 4.5 cent increase to refined petroleum products in lieu of the 25 per cent. advance. Then, when the subsequent general increase of 35 per cent. was made by the Commission, as well as the later reduction of 21.5 of the rates "in the Western group," both affected the two classes; that is, the fifth class and commodity rates which still kept the rates charged by the defendants within those prescribed in the fifth class. It was not until the Commission, in its Docket No. 13535, reduced the fifth class rates effective July 14, 1928, to figures below the commodity rates which were applicable under the previous findings in No. 8418, as increased to the extent of 25 per cent. (subsequently changed to a flat 4.5 cents) by the Director General, and 35 per cent. by the Commission (later reduced to 21.5 of the Western group), that there was any difference or discrepancy upon which the award was made. I think undoubtedly the rates fixed by the Commission in No. 8418, as modified and approved by the Commission, after the action of the Director General, which resulted in a maximum of 32.5 cents per hundred, were Commission made, but both the 35 per cent. general increase thereafter granted in Ex Parte 74, and its subsequent modification in Docket No. 13293, were of a general character, which left to the carrier the duty of adjusting its rates within those limits so as not to be unreasonable. In any event, the original requirement of the order in No. 8418 that the commodity rates on refined petroleum products should not exceed the fifth class rates was never at any time changed or removed, and the duty of the carriers to charge rates within those limits continued at all times, regardless of the fact that I have concluded the increase allowed to the extent of the maximum of 32.5 were Commission made rates.

The plaintiff should therefore have judgment as prayed for.

Proper decree should be presented.